UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

NAM LUU-VAN, a married man,

              Plaintiff,

       v.

RUSS HAMILTON, a married man
and his marital community;
TOR HARTMANN, a married man
and his marital community;
DEAN MARTINEZ, a married man
and his marital community;
SOLAR GRADE SILICON, LLC, a
Washington limited liability
company,

              Defendants.

NO. CV-04-0492-EFS

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

An in-person hearing was held on Defendants' Motion for Summary Judgment (Ct. Rec. 34) on April 26, 2006, in Richland, Washington. Plaintiff Nam Luu-Van was represented by Patrick Kirby, and Defendants were represented by James Kalamon. After reviewing the submitted materials, cited authority, and hearing oral argument, the Court is fully informed and hereby grants Defendants' motion.

///

///

///

///

ORDER * 1

# I. Background[1]

Plaintiff came to the United States from Vietnam in 1975 and is now a United States citizen. (Ct. Rec. 49 Ex. A. at ¶ 2.)  In September 2002, Defendant Solar Grade Silicon, LLC ("SGS"), through its President Tor Hartmann and Human Resource Manager Dean Martinez, hired Plaintiff as its Research and Development Test ("R&D") Coordinator in its Fluid Bed Reactor Department ("FBR Department"). (Ct. Recs. 1 ¶ 15 & 49 Ex. E at 8-9.)  Prior to being hired by SGS, Plaintiff spent seven years working as a chemical engineer for Advanced Silicon Materials, Inc. ("ASiMI"), a company purchased by SGS in 2002. (Ct. Recs. 49 Ex. A at ¶ 2.)  Before accepting his position with SGS, Plaintiff requested and was granted a substantial salary increase. (Ct. Rec. 36 Ex. H (from $71,148.00 to $80,054.00, resulting in a 12.52% salary increase).)

As the R&D Coordinator, Plaintiff coordinated the technical and scientific aspects of the FBR Department and supervised the FBR Department's four R&D operators: Steven Jones (Caucasian), Mike Adamos (Hispanic), Gib Mathias (Caucasian), and Barry Wemp (Caucasian). (Ct. Rec. 49 Exs. A & C.)  Plaintiff's supervisory role did not include the authority to hire, discharge, promote, or demote any SGS employees. *Id.*

---

[1] In ruling on a motion for summary judgment, the Court considers the facts and all reasonable inferences therefrom as contained in the submitted affidavits, declarations, exhibits, and depositions, in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1972) (*per curiam*).  The following factual recitation was created with this standard in mind.

ORDER * 2

at Exs. B & E.  When Plaintiff was hired as the R&D Coordinator, Jeff Hansen (Caucasian) was hired as the R&D Manager. *Id.* at E.  As the R&D Manager, Mr. Hansen was responsible for the FBR Department's operations and directly supervised Plaintiff. *Id.* at Ex. C.

On July 7, 2003, due to complaints of poor performance raised by Plaintiff and supported by the FBR operators, Mr. Martinez conducted an "assimilation" with Mr. Hansen. *Id.* at Exs. C & F.  During the assimilation, Mr. Hansen was provided an opportunity to explain his position to his peers and the employees he supervised. *Id.*  In addition, Mr. Hansen received feedback on ways to improve and resolve the problems complained of by Plaintiff and the FBR operators. *Id.*  In August 2003, following his assimilation, for unexplained reasons, Mr. Hansen was transferred out of the FBR Department and became SGS's Technical Staff Manager. *Id.* at Ex. C.  When Mr. Hansen was transferred out of the FBR Department, Mr. Hamilton assumed the role of FBR Manager and became Plaintiff's direct supervisor. *Id.*

Beginning in August 2003, Plaintiff claims to have begun discussing with Mr. Hamilton and Mr. Hartmann his "concerns regarding several mistakes by the R&D operators which had a negative impact upon the R&D testing and safety." *Id.* at Ex. A ¶ 3.  In addition, Plaintiff specifically claims to have notified Mr. Hamilton in September 2003 "that [Operator] Jones' errors were continuing and negatively impacting the R&D testing as well as the safety of the employees." *Id.* at Ex. A ¶ 4.  In response to these concerns, Plaintiff was permitted to develop "operator flow sheets which would allow for assigning operators individual tasks to best utilize each operator's skill and minimize mistakes and process

ORDER * 3

variations." *Id.*  However, despite the new flow charts, Plaintiff claims Operators Jones and Mathias continued to make mistakes and not meet his expectation for operators. *Id.* at Ex. A ¶ 4-7.  Aside from Plaintiff's vague assertions that he notified Mr. Hamilton and Mr. Hartmann of safety concerns "beginning in August 2003" and "September 2003," no other submitted evidence discusses Plaintiff's purported "safety" concerns or complaints thereof to Defendants.

In a February 19, 2004, meeting between Plaintiff, Mr. Hamilton, and Mr. Martinez, Plaintiff claims the group "agreed it was necessary to begin transferring Mr. Jones and Mr. Mathias out of the R&D unit." Id. at Ex. A. ¶ 8.  At the end of the meeting, Plaintiff alleges that Mr. Hamilton indicated he would take the lead on transferring the two operators out of the FBR Department. *Id.*  Then, on February 27, 2004, Mr. Hamilton met with the four FBR Department operators. *Id.* at Ex. A. ¶ 9. Following this meeting, Operator Adamos was asked by Mr. Hamilton to replace Operator Jones as the lead operator, but Operators Jones and Mathias were permitted to remain in the FBR Department. *Id.*  Plaintiff protested Mr. Hamilton's decision to not transfer the two operators by complaining to Mr. Hartmann during a conversation also held on February 27, 2004. *Id.*  Mr. Hartmann informed Plaintiff that he was unaware of Mr. Hamilton's recent decisions and recommended Plaintiff discuss the issue with Mr. Hamilton at the beginning of the next week. *Id.*

In accordance with Mr. Hartmann's advice, Plaintiff emailed a written evaluation of the four operators to Mr. Hamilton and Mr. Martinez on Monday, March 1, 2004. *Id.* at Ex. I.  In his email evaluation, Plaintiff noted the importance of having operators with technical skills

suited to the needs of the FBR Department and recounted what he believed were the current operators' strengths and deficiencies. *Id.*    In the course of his evaluation, Plaintiff indicated Operator Jones and Mathias were not meeting his expectations and that he did not believe the two operators were good matches for the FBR Department. *Id.*  With regard to Operator Mathias, Plaintiff stated:

> He has not exhibited a sharp focus on test quality and does not follow detailed test procedures well.  His operating skill is inconsistent.  In addition, his emotions and behavior are somewhat volatile.  During the test runs he often exhibited a negative attitude that had a negative impact on the group's dynamic, and on test performance.  My recommendations: Gib is not a good candidate for the fluid bed operator position. His involvement with the program may potentially cause negative impacts on the program's progress in the future.

*Id.*  With regard to Operator Jones, Plaintiff stated:

> He has not demonstrated himself to be a self starter, and he does not have a strong focus on test details and quality. Specifically he is not able to respond quickly to day-to-day process problems, and he is easily side tracked with low priority tasks.  His operating skill and performance are not consistent from test to test, and he often makes a mistake. He needs constant supervision.  My recommendation: Steve does not appear to be a good match for the fluid bed operator position.

*Id.*    Plaintiff then indicated that Operators Adamos' and Wemp's performances exceeded Plaintiff's expectations and that he believed they were well suited for their current operator positions. *Id.*  On March 2, 2004, following their receipt of Plaintiff's email evaluation, Operator Mathias was transferred out of the FBR Department to the Poly Department.

On March 4, 2004, Plaintiff was called into a meeting with Mr. Hamilton and Mr. Martinez. (Ct. Rec. 36 Ex. C.)  During this meeting, Plaintiff was informed of numerous complaints lodged against him by the four operators and that his employment with SGS was suspended. *Id.*  Most

of the complaints against Plaintiff were included in written statements separately written by the four operators. *Id.* at Exs. C-G.  In general, the operators each accused Plaintiff of (1) manipulating them into helping Plaintiff have Mr. Hansen transferred; (2) coercing them into helping Plaintiff complete repairs to his home after hours or during their vacation time; (3) threatening to have them fired if they did not comply with his commands; and (4) withholding or having them withhold information concerning SGS tests in an effort to make Mr. Hansen and Operators Jones and Mathias appear to be failures. *Id.*  Each of the operators claimed they believed Plaintiff would and could have had their employment terminated if they did not comply. *Id.*  Plaintiff denied each of the operators' allegations. *Id.*  Following this meeting, Plaintiff's security badge was taken from him and he was escorted off SGS property. *Id.* at Ex. C.

On March 5, 2004, Plaintiff was summoned back to SGS for another meeting with Mr. Hamilton and Mr. Martinez. *Id.*  During this meeting, Plaintiff was informed that his employment had been terminated. *Id.*  At that time Plaintiff was provided with a termination letter from Mr. Hamilton that stated:

> [Y]our employment is being terminated effective immediately for conduct that has created an intimidating, hostile and offensive work environment.  Based on my investigation, I have found that your behavior was not conducive to the type of behavior that is expected of individuals who supervise people in our company. Specifically, you have threatened each operator with their jobs if they do not comply with your demands.  Many of those demands were unreasonable such as withholding process information from other operators and staff in an attempt to make them fail; coercing employees to tell management that specific operators were deficient and should be removed from the project. This action has impacted one individual personally and the situation will be rectified.

ORDER * 6

> Based on the testimony of several individuals, the work environment in the fluid bed department was hostile and intimidating. And those working conditions cannot be tolerated by the company. With the above explanation and the seriousness of this issue, I find no other alternative than to sever this employment relationship.

(Ct. Rec. 49 Ex. K.)

Plaintiff appealed his termination to Mr. Hartmann in a letter written on March 15, 2004. (Ct. Rec. 36 Ex. K.) In this letter, Plaintiff again denied the operators' accusations and indicated that his recommendations with regard to Operators Jones and Mathias were based on sincere performance and business-related concerns. *Id.* On April 1, 2004, in response to Plaintiff's March 15, 2004, letter, Mr. Hartmann denied Plaintiff's request for reinstatement by stating:

> In situations involving the termination of an employee, I consider all testimony before reaching a conclusion. First, I have taken the time to talk to all parties involved, including the operators, your Manager, Russ Hamilton, and other staff members. After further discussion and review of supporting documentation, I found compelling evidence that supports the decision. This includes written statements and confirmation from all four operators.

> I then reviewed the accusations that were set forth in your termination letter and those relayed in your response. Although I understand that you are in disagreement with those accusations, I have concluded that the work environment in the Fluid Bed Department was hostile. The hostility was to the point where the operators were afraid to come forward with their concerns. An operator was demoted from his position and it was later discovered that his decision, based on your input, was without merit. There are numerous instances where your behavior is considered to be intimidating and coercing, which resulted in the conclusion that the work environment was hostile.

*Id.* at Ex. L. In general, Defendants now explain that they accepted the operators' statements over Plaintiff's statements because they found the operators more credible due to the detail of and consistency between

ORDER * 7

1    their complaints.  Plaintiff was later replaced by Elias Macalad, who is
2    of Filipino descent. *Id.* at Ex. C.

3        Plaintiff alleges Defendants' decision to terminate his employment
4    was motivated by his Vietnamese race and national origin, and reporting
5    of safety concerns, all in violation of federal and state law.   In
6    addition, Plaintiff claims Defendants are liable under separate theories
7    of negligent infliction of emotional distress and outrage.  Defendants
8    now move for summary judgment on each of Plaintiff's claims.

9                    **II. Summary Judgment Standard**

10       Summary judgment will be granted if the "pleadings, depositions,
11   answers to interrogatories, and admissions on file, together with the
12   affidavits, if any, show that there is no genuine issue as to any
13   material fact and that the moving party is entitled to judgment as a
14   matter of law." FED. R. CIV. P. 56(c).  When considering a motion for
15   summary judgment, a court may not weigh the evidence nor assess
16   credibility; instead, "the evidence of the non-movant is to be believed,
17   and all justifiable inferences are to be drawn in his favor." *Anderson*
18   *v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A genuine issue for
19   trial exists only if "the evidence is such that a reasonable jury could
20   return a verdict" for the party opposing summary judgment. *Id.* at 248.

21       If the party requesting summary judgment demonstrates the absence
22   of a genuine material fact, the party opposing summary judgment "may not
23   rest upon the mere allegations or denials of his pleading, but . . . must
24   set forth specific facts showing that there is a genuine issue for trial"
25   or judgment may be granted as a matter of law. *Anderson*, 477 U.S. at 248.
26   This requires the party opposing summary judgment to present or identify

ORDER * 8

in the record evidence sufficient to establish the existence of any challenged element that is essential to that party's case and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Failure to contradict the moving party's facts with counter affidavits or other responsive materials may result in the entry of summary judgment if the party requesting summary judgment is otherwise entitled to judgment as a matter of law. *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996).

### III. Plaintiff's Title VII Claim

Under Title VII, it is an unlawful employment practice for an employer to

> fail or refuse to hire or to discharge any individual, or
> otherwise to discriminate against any individual with respect
> to his compensation, terms, conditions, or privileges or
> employment because os such individual's race, color, religion,
> sex, or national origin[.]

42 U.S.C. § 2000e-2(a)(1). A plaintiff alleging discrimination under Title VII may prove his claim under the separate theories of disparate treatment or disparate impact. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). In this case, because Plaintiff only alleges a disparate treatment theory of liability, the Court does not address the theory of disparate impact.

"Disparate treatment claims require the plaintiff to prove that the employer acted with conscious intent to discriminate." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 854 (9th Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805-06 (1973) (distinguishing *Griggs*, 401 U.S. 424)). Although a plaintiff is free to prove his Title VII claim by simply offering direct or circumstantial evidence of discriminatory

intent, plaintiffs typically invoke the *McDonnell Douglas* burden-shifting framework when attempting to avoid summary judgment on disparate treatment claims. *Id.* at 854-55.

Under the *McDonnell Douglas* burden-shifting framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). To establish a Title VII *prima facie* case under *McDonnell Douglas*, a plaintiff must introduce evidence giving rise to an inference of unlawful discrimination. *Id.* This is typically done in Title VII discharge cases by offering proof that (1) the plaintiff belongs to a class of persons protected by Title VII; (2) the plaintiff performed his or her job satisfactorily; (3) the plaintiff's employment was terminated; and (4) the plaintiff's former position was filled by someone outside of his or her protected class. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).

"Establishing a *prima facie* case under *McDonnell Douglas* creates a presumption that the plaintiff's employer undertook the challenged employment action because of the plaintiff's race." *Id.* This presumption shifts the burden of production to the employer to "produce admissible evidence showing that the defendant undertook the challenged employment action for a 'legitimate, nondiscriminatory reason.'" *Id.*; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). If the employer meets its burden of production, "the presumption of unlawful discrimination simply drops out of the picture and the plaintiff may defeat summary judgment by satisfying the usual standard of proof

ORDER * 10

1   required in civil cases under [Rule] 56(c)." *Id.* (citing *Reeves v.*

2   *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *St.*

3   *Mary's Honor Ctr.*, 509 U.S. at 511)) (internal quotations omitted).

4         Under the *McDonnell Douglas* framework, a Title VII plaintiff

5   satisfies the standard of proof required to avoid summary judgment by

6   demonstrating that a genuine issue of material fact exists regarding

7   whether the employer's proffered explanation for the adverse action is

8   merely pretext for a discriminatory motive. *Burdine*, 450 U.S. at 256.

9   A plaintiff meets this burden by presenting sufficient evidence to permit

10   a rational fact finder to conclude by a preponderance of the evidence

11   that the adverse employment action was taken "because of" the plaintiff's

12   race, color, religion, sex, or national origin. *Costa v. Desert Palace,*

13   *Inc.*, 299 F.3d 838, 847 (9th Cir. 2002).

14         Although the plaintiff is free to prove his Title VII claim by

15   demonstrating the adverse employment action was solely taken due to his

16   protected status, the plaintiff is *only required* to demonstrate his race,

17   color, religion, sex, or national origin was a *motivating factor* for the

18   adverse employment action.[2] 42 U.S.C. § 2000e-2(m); *Costa*, 299 F.3d at

19   848. However, if a plaintiff proves a mixed motive case, the employer

20   may be entitled to limited relief if it demonstrates it "would have taken

21   the same action in the absence of the impermissible motivating factor .

22   . . ." 42 U.S.C. § 2000e-5(g)(2)(B). Potential relief under § 2000e-

23

24                       ————————

25         [2] Title VII cases that involve adverse employment actions which were

    motivated by more than one factor are sometimes referred to as "mixed-

26   motive" cases. *Costa*, 299 F.3d at 848.

ORDER * 11

1  5(g)(2)(B) includes, but in not limited to, a prohibition on damages and

2  the award of attorney's fees and costs connected to the plaintiff's

3  pursuit of her mixed motive claim. *Id.*

4      When attempting to defeat summary judgment on either a single- or

5  mixed-motive Title VII claim, a plaintiff may exclusively rely on

6  circumstantial evidence, so long as such evidence is "specific" and

7  "substantial." *Cornwell*, 439 F.3d at 1029-30.  Evidence is specific and

8  substantial if it is "sufficient to raise a genuine issue of material

9  fact under Rule 56(c)." Id. at 1029 (citing *Wallis v. J.R. Simplot Co.*,

10  26 F.3d 885, 890 (9th Cir. 1994).

11  **A. Plaintiff's *Prima Facie* Case**

12      Plaintiff produced sufficient evidence to establish a *prima facie*

13  case of discrimination under Title VII.  First, it is undisputed that

14  Plaintiff is Vietnamese, which is a protected class in both a national

15  origin and a race analysis.  Second, it is also undisputed that

16  Plaintiff's employment was terminated by Defendants.  Third, through his

17  denial of the misconduct alleged by the operators and submission of

18  positive work evaluations, Plaintiff has produced sufficient evidence

19  that he was doing satisfactory work.  Fourth and finally, because

20  Plaintiff was replaced by a person of Filipino descent, which is

21  different than Plaintiff's Vietnamese national origin and race, he has

22  established the fourth element of a *prima facie* case of Title VII

23  discrimination. *See generally Dawavendewa v. Salt River Arg. Imp. & Power

24  Dist.*, 154 F.3d 1117 (9th Cir. 1998).

25      Because Plaintiff has met his initial burden of production under

26  *McDonnell Douglas*, a presumption arises that Defendants violated Title

ORDER * 12

VII when they discharged Plaintiff and the burden of production shifts to them to provide a nondiscriminatory explanation for the termination. *Cornwell*, 439 F.3d at 1028.

**B. Defendants' Nondiscriminatory Explanation**

Defendants explain that their decision to terminate Plaintiff's employment was unrelated to his Vietnamese national origin or race. According to Defendants, Plaintiff was discharged for misconduct that created a hostile work environment for its R&D operators. In support of their decision to terminate Plaintiff, Defendants describe their investigative process, the complaints lodged against Plaintiff by the four operators, and Defendants' basis for believing the operators' accounts over Plaintiff's account. This evidence satisfies Defendants' burden of production under *McDonnell Douglas* and the presumption of discrimination "drops out of the picture." *Id.* (citations omitted). The burden of production now shifts back to Plaintiff to produce "specific" and "substantial" evidence that Defendants' explanation is pretext for a discriminatory motive. *Id.*

**C. Plaintiff's Purported Circumstantial Evidence of Discrimination**

Plaintiff offers no direct evidence of discrimination, but instead relies wholly on what he believes is circumstantial evidence to support his claim that Defendants' decision to terminate his employment was motivated, at least in part, by his Vietnamese national origin and/or race. Plaintiff's purported circumstantial evidence of discrimination falls into two categories: (1) evidence that Plaintiff should not have been terminated for misconduct and (2) evidence that Plaintiff was disciplined differently than non-Vietnamese employees. Although

ORDER * 13

Plaintiff need not produce direct evidence of discrimination to avoid summary judgment and may rely exclusively on circumstantial evidence, the Court finds Plaintiff has nonetheless not provided sufficient circumstantial evidence to avoid summary judgment.

**1. Purported Circumstantial Evidence that Plaintiff Should Not Have Been Terminated for Misconduct**

In support of his argument that Defendants' explanation for his discharge is pretext for discriminatory motives, Plaintiff emphasizes (1) his belief that Operators Mathias and Jones were underperforming, (2) that he regularly complained to Mr. Hamilton, Mr. Martinez, and Mr. Hartmann about the two operators' incompetence between the Fall of 2003 and his termination in March 2004, and (3) that he did not create a hostile work environment.  Plaintiff's reliance on these alleged facts apparently is intended to discredit Defendants' rationale for terminating his employment and expose the operators' alleged motives for complaining to Mr. Hamilton.

Despite his repeated insistence that the operators' stories are untrustworthy and that he did not create a hostile work environment, these arguments are immaterial to a determination of whether Plaintiff's discharge was the product of unlawful discriminatory motives because this evidence does not prove any of the *Defendants*, i.e. Mr. Hartmann, Mr. Hamilton, or Mr. Martinez, were motivated to terminate Plaintiff's employment due to Plaintiff's national origin and/or race.  At most, the submitted evidence merely supports findings that Defendants' investigation was incomplete or that Plaintiff had not engaged in misconduct deserving of termination.  Accordingly, Plaintiff's evidence that he should not have been terminated for misconduct does not support

ORDER * 14

a finding that a genuine issue of material fact exists regarding whether Defendants' explanation for terminating Plaintiff's employment was pretext for discriminatory motives.

### 2. Purported Circumstantial Evidence that Plaintiff was Disciplined Differently than Non-Vietnamese Employees

Plaintiff also compares the disciplinary action taken against him (termination) with that which was taken against non-Vietnamese employees in his attempt to demonstrate he was terminated by Defendants due to his national origin and/or race.   In this effort, Plaintiff offers Defendants' purported disparate disciplinary practices as circumstantial evidence of discriminatory animus towards Plaintiff's Vietnamese heritage.   Specifically, Plaintiff points to what he believes was disparate disciplinary treatment between himself and Mr. Hansen and Operators Mathias, Jones, and Wemp.

In particular, Plaintiff complains he was not provided the opportunity to confront his co-workers in an assimilation meeting as Mr. Hansen, a Caucasian employee, had been permitted to do when Plaintiff complained about Mr. Hansen's performance in July 2003.   Furthermore, Plaintiff contrasts Defendants' decision to terminate his employment with Defendants' decisions to simply (1) transfer Mr. Hansen and Operator Mathias to different departments, (2) demote Operator Jones, and (3) require Operator Wemp to take a small period of time off with no pay when disciplinary action was taken in their independent cases.

Although Plaintiff correctly describes the different ways he and his co-workers were disciplined, because Plaintiff and the other employees were not similarly situated, the comparisons do not support a conclusion that a different disciplinary standard was applied to Plaintiff due to

ORDER * 15

his nation origin and/or race than that which was applied to the Caucasian employees. First, Mr. Hansen and Operators Mathias and Jones were each disciplined for performance-based reasons rather than misconduct as Plaintiff was. This fundamental difference proscribes a valid comparison of Mr. Hansen's and the operators' disciplinary treatment from Plaintiff's disciplinary treatment since employers necessarily address performance and misconduct problems differently. *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1121 (9th Cir.2004) (internal quotation marks omitted) (quoting *Jauregui v. City of Glendale*, 852 F.2d 1128, 1134 (9th Cir.1988) ("A person suffers disparate treatment in his employment 'when he or she is singled out and treated less favorably than others similarly situated on account of race.'")); *Reynolds v. Humko Prod.*, 756 F.2d 469, 472 (6th Cir. 1985) (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 (1976)) ("While an employer may determine that certain misconduct is grounds for termination, the standard must be 'applied, alike to members of all races.'").

Comparing Plaintiff's termination for creating a hostile work environment with the disciplinary action taken against employees for poor performance is like comparing apples to oranges. *Id.* This is because employees who are unable to meet certain performance goals, such as Mr. Hansen and Operators Mathias and Jones, may nonetheless be effective in different roles with their company, whereas an employee who creates a hostile work environment, such as Defendants submit Plaintiff did, may not be transferable due to the legal and morale-related risks associated with continuing to employ that type of employee in the same or a different position. *Id.* Thus, Plaintiff's comparison of his disciplinary

ORDER * 16

treatment to Mr. Hansen's and Operator's Mathias' and Jones' disciplinary treatment does not serve as circumstantial evidence that non-Vietnamese employees were disciplined less severely than Plaintiff, a Vietnamese employee, was.

Similarly, the circumstances relating to Defendants' discipline of Operator Wemp are easily distinguished from the circumstances Defendants faced when terminating Plaintiff.  In 2001, when Operator Wemp worked for AsiMI, before it was purchased by SGS, he was accused of creating a hostile work environment when he flared his chest, clenched his fists, and called a co-worker a "little bitch" and "Mother Fucker" in a short, isolated dispute. (Ct. Rec. 49 Ex. N.)  In that instance, Operator Wemp was not terminated, but instead received a written warning and was required to take a short period of time off without pay. *Id.* at Ex. C.

Although Defendants' reasons for disciplining Operator Wemp are more akin to those asserted for disciplining Plaintiff than those for disciplining the other employees, the Court nonetheless believes Operator Wemp was not similarly situated with Plaintiff and that Plaintiff's comparison of his discipline to Operator Wemp's discipline fails to demonstrate he was held to a different disciplinary standard than non-Vietnamese employees were.  First, Operator Wemp's misconduct was an isolated incident, whereas Plaintiff's alleged misconduct occurred over the course of months and involved numerous offenses.  Second, Operator Wemp was a lower-level employee at the time of this outbreak and as a result, his misconduct did not involve a comparable abuse of authority to that which is found in Plaintiff's case.  Finally, although Operator Wemp was disciplined as an employee of ASiMI, a company purchased by SGS,

no evidence has been offered that any named Defendant was involved in the disciplinary action taken against Operator Wemp.  Thus, there is no basis for comparing the alleged motives behind Operator Wemp's treatment to Defendant's motives for terminating Plaintiff.

Therefore, because Plaintiff has failed to present any direct or relevant circumstantial evidence to support a finding that Defendants' reasons for terminating his employment was pretext for discriminatory motives, Plaintiff has failed to carry his burden of demonstrating the existence of a genuine issue of material fact concerning his Title VII claim under Rule 56, the Court grants summary judgment to Defendants on this issue.

## IV. Plaintiff's § 1981 & WLAD Claims

For the same reasons explained above with regard to Plaintiff's Title VII claims, the Court also grants summary judgment in favor of Defendants on Plaintiff's § 1981 and WLAD claims.

**A. § 1981 Claim**

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  Under § 1981, "'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b).  These rights are "protected against impairment by nongovernmental discrimination and impairment under color of State law." *Id.* § 1981(c).  "The *McDonnell Douglas* framework is also

ORDER * 18

applicable to employment discrimination claims under 42 U.S.C. § 1981."
*Cornwell*, 439 F.3d at 1028 n.5 (citations omitted).

Here, even assuming Plaintiff was denied a right to make or enforce a contract under § 1981, an issue the Court takes no position on in this Order, Defendants are nonetheless entitled to summary judgment on Plaintiff's § 1981 claim because Plaintiff failed to present sufficient evidence to demonstrate such denial was connected to his national origin or was in any way discriminatory. For this reason, the Court grants summary judgment to Defendants on Plaintiff's § 1981 claim.

**B. WLAD Claim**

In Washington State, under the Washington Law Against Discrimination ("WLAD"), the "right to be free from discrimination because of race . . . is recognized as and [has been] declared to be a civil right." R.C.W. § 49.60.030(1). It is an unfair practice and actionable under the WLAD for any employer to discharge any person from employment because of race, creed, color, or national origin. R.C.W. § 49.60.180(2). When addressing WLAD claims in the context of a motion for summary judgment, courts utilize the *McDonnell Douglas* burden-shifting framework. Here, as is the case with Plaintiff's Title VII and § 1981 claims, the Court grants summary judgment in favor of Defendants on Plaintiff's WLAD claim due to Plaintiff's failure to provide sufficient evidence to support a finding that he was discharged *because of* his national origin.

## IV. Plaintiff's Wrongful Discharge Tort Claim

"Under the common law, at-will employees could quit or be fired for any reason." *Gardner v. Loomis Armored Inc.*, 128 Wash. 2d 931, 935 (1996) (citing *Roberts v. Atlantic Richfield Co.*, 88 Wash. 2d 887, 891 (1977)).

ORDER * 19

One exception to the general terminable-at-will rule is that "employees may not be discharged for reasons that contravene public policy." *Id.* This exception was first recognized by the Washington Supreme Court in *Thompson v. St. Regis Paper Co.*, 102 Wash. 2d 219 (1984), when the Supreme Court ruled that a plaintiff could pursue a wrongful discharge tort claim against his former employer under a theory that his employment was terminated because he instituted an accounting program required by federal law. *Id.*

> In creating a public policy tort action, *Thompson* cautioned the exception should be narrowly construed in order to guard against frivolous lawsuits:

>> In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy. However, courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject.

*Gardner*, 128 Wash. 2d at 936-37 (quoting *Thompson*, 102 Wash. 2d at 232). "Determining what qualifies as a clear mandate of public policy is a question of law." *Id.* at 937 (citing *Dicomes v. State*, 113 Wash. 2d 612, 617 (1989)).

To prove a wrongful discharge in violation of public policy claim, a plaintiff must prove: (1) the existence of a clear public policy; (2) that discouraging the conduct in which the plaintiff engaged would jeopardize the public policy; and (3) that the public-policy-linked conduct caused the dismissal. *Id.* at 941. Furthermore, the "defendant must not be able to offer an overriding justification for the dismissal." *Id.*

ORDER * 20

1    In his Complaint, Plaintiff alleges the following wrongful discharge
2 in violation of public policy claim:

> Plaintiff's termination of employment was a wrongful discharge
> in contravention of public policy set forth in the Occupational
> Safety and Health Act (OSHA), 29 USC § 651 et seq., and the
> Washington Industrial Safety and Health Act (WISHA), RCW 49.17
> et seq.  Plaintiff was discharged because of his efforts to
> ensure that research and testing procedures at SGS were carried
> out in a safe manner consistent with the requirements of OSHA
> and WISHA and their regulations.

(Ct. Rec. 1 ¶ 39.)  Because Plaintiff has failed to demonstrate a genuine
issue of material fact exists regarding whether his discharge was caused
by the reporting of safety violations, Defendants are entitled to
judgment as a matter of law on this claim.

    In opposition to Defendants' request for summary judgment on this
claim, Plaintiff claims he "repeatedly told his supervisors about his
concerns over operators Mathias' and Jones' unsafe job performances."
(Ct. Rec. 44 at 20.)  Despite Plaintiff's insistence that this assertion
is true, the evidence submitted in the record does not support such a
finding.  Although there is evidence that Plaintiff repeatedly reported
his concerns with Operators Mathias and Jones to Defendants, these
complaints were almost exclusively limited to efficiency and performance
concerns, not safety.  The only evidence in the record that Plaintiff
reported safety concerns to Defendants is found in two statements
contained in a declaration by Plaintiff that was submitted with his
responsive memorandum. (Ct. Rec. 49 Ex. A.)  In this declaration,
Plaintiff makes the following two statements:

> Beginning in August 2003, I began to discuss with The
> President, Mr. Tor Hartmann, and the maintenance and
> engineering manager, Mr. Russ Hamilton, of SGS my concerns
> regarding several mistakes by the R&D operators which had a
> negative impact upon the R&D testing and safety.

ORDER * 21

           \*        \*        \*        \*

In September 2003, I notified Mr. Hamilton that Mr. Jones' errors were continuing and negatively impacting the R&D testing as well as the safety of the employees.

*Id.* at ¶¶ 3 & 4.

Aside from the above noted statements by Plaintiff, the record contains no other evidence of Plaintiff's alleged safety concerns or violation reporting.  However, even accepting these two occurred, the undisputed evidence shows that Plaintiff was given authority by Defendants to develop operator work flow sheets for assigning operators individual tasks to "best utilize each operator's skill and minimize mistakes and process variations" and to recommend lead operator expectations for Operator Jones, which were later implemented by Mr. Hamilton. *Id.* Giving Plaintiff such authority is completely inconsistent with discharging him for expressing safety concerns.

Instead, the bulk of Plaintiff's continuing operator complaints focus exclusively on performance- and quality-related concerns.  The most glaring examples of Plaintiff's performance- and quality-related focus are found in (1) Plaintiff's March 1, 2004, operator evaluation email to Mr. Hamilton and Mr. Martinez and (2) Plaintiff's March 15, 2004, post-termination letter to Mr. Hartmann. (Ct. Rec. 49 Ex. I & 36 Ex. K.) Although Plaintiff evaluates the operator's performances and explains why he complained about the operators in these letters, he never mentions any safety concerns or OSHA/WISHA violations he was hoping to correct by complaining about the operator's deficiencies. *Id.* Instead, Plaintiff's comments about the operators were limited to performance and quality concerns.

ORDER * 22

Thus, the only evidence offered by Plaintiff to support his claim that reporting safety concerns caused, or at least in part caused, his discharge are the generalized safety concerns made to Mr. Hartmann and Mr. Hamilton in the Fall of 2003, approximately six months before Plaintiff's employment was terminated.  For this reason and because Plaintiff (1) did not raise any safety concerns in his March 1, 2004, operators evaluation or the March 15, 2004, post-termination letter to Mr. Hartmann, which were both written within days of Defendants' March 5, 2004, decision to terminate Plaintiff's employment and (2) has pointed to no specific OSHA or WISHA safety violations by Defendants or the operators, the Court finds Plaintiff failed to demonstrate the existence of any nexus between his safety concerns and his termination. Accordingly, because the Court finds no genuine issue of material fact exists regarding whether Plaintiff's discharge was caused by reporting safety violations, Plaintiff is unable to prove his wrongful discharge in violation of public policy claims and Defendants' corresponding requests for summary judgment are granted. *Gardner*, 128 Wash. 2d at 941 (The former employee must prove that the public-policy-linked conduct caused the dismissal.).

**V. Plaintiff's Negligent Infliction of Emotional Distress Claim**

To prove a claim of negligent infliction of emotional distress ("NIED") against an employer, a plaintiff must show:

> (1) that [his] employer's negligent acts injured [him], (2) the acts were not a workplace dispute or employee discipline, (3) the injury is not covered by the Industrial Insurance Act, and (4) the dominant feature of the negligence claim was the emotional injury.

ORDER * 23

1  *Snyder v. Med. Serv. Corp. of E. Wash.*, 98 Wash. App. 315, 323 (1999)

2  (citations omitted). "Like all negligence claims, a negligent infliction

3  of emotional distress claim requires duty, breach, proximate cause, and

4  injury." *Id.* (citing *Hunsley v. Giard*, 87 Wash. 2d 424, 434-35 (1976)).

5  "Emotional distress is 'a fact of life' and so the elements of duty,

6  breach, causation, and injury place limits on an employer's liability for

7  emotional distress." *Id.* "[A]bsent a statutory or public policy mandate,

8  employers do not owe employees a duty to use reasonable care to avoid the

9  inadvertent infliction of emotional distress when responding to workplace

10 disputes." *Bishop v. State*, 77 Wash. App. 228, 234-35 (1995).

11      Plaintiff claims his NIED claim is independent of his discrimination

12 claim and that Defendants are liable for conducting a "sham"

13 investigation in connection with his discharge.  Because employers are

14 protected from NIED liability connected to employee discipline, *see*

15 *Snyder,* 98 Wash. at 315, the Court finds Plaintiff is incapable of

16 proving his NIED claim as asserted because it is based on the procedures

17 implemented by Defendants in the course of their investigation and

18 subsequent termination of Plaintiff's employment.  Furthermore, even if

19 Defendants did conspire to conduct a sham investigation, this type of

20 conduct would have been intentional and not negligent as is required

21 under a NIED theory.  For these reasons, the Court grants summary

22 judgment in favor of Defendants on Plaintiff's NIED claims.

23                      **VI. Plaintiff's Outrage Claim**

24      The basic elements of an outrage claim are: "(1) extreme and

25 outrageous conduct; (2) intentional or reckless infliction of emotional

26 distress; and (3) actual result to the plaintiff of severe emotional

distress." *Dicomes v. State*, 113 Wash. 2d 612, 630 (1989) (quoting *Rice v. Janovich*, 109 Wash. 2d 48, 61, 742 P.2d 1230 (1987)).  "The conduct in question must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Grimsby v. Samson*, 85 Wash. 2d 52, 59 (1975)). "The question of whether certain conduct is sufficiently outrageous is ordinarily for the jury, but it is initially for the court to determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." *Id.* (citing *Phillips v. Hardwick*, 29 Wash. App. 382, 387, 628 P.2d 506 (1981)).

Plaintiff claims the evidence in the record supports a finding that Defendants' conduct "exceeded all bounds of decency measured by an objectionable measure of reasonableness." (Ct. Rec. 44 at 23.)  Because the Court finds Plaintiff is incapable of proving he was discriminated against or that he was discharged as a result of reporting safety concerns, the allegations upon which Plaintiff bases his outrage claim, the Court concludes that no reasonable mind could find Defendants' conduct was sufficiently extreme to result in outrage liability. Accordingly, Defendants are also granted summary judgment on Plaintiff's outrage claims.

## VII. Conclusion

For the reasons set forth above, the Court grants summary judgment on each of Plaintiff's claims in favor of Defendants and dismisses this action.

ORDER * 25

1       Accordingly, **IT IS HEREBY ORDERED:** Defendants' Motion for Summary

2   Judgment **(Ct. Rec. 34)** is **GRANTED.**   Judgment is awarded in favor of

3   Defendants on all claims brought against them in this action by

4   Plaintiff.

5       **IT IS SO ORDERED.**   The District Court Executive is directed to:

6       (A) Enter this Order;

7       (B) Enter judgment in favor of Defendants on all claims alleged by

8   Plaintiff in this action;

9       (C) Deny all pending motions as moot;

10      (C) Strike the currently scheduled June 19, 2006, trial;

11      (D) Provide copies of this Order and the Judgment to counsel; and

12      (E) Close this file.

13      **DATED** this ____2nd____ day of June 2006.

14

15                      ___S/ Edward F. Shea_____
                            EDWARD F. SHEA
16                     United States District Judge

17

    Q:\Civil\2004\0492.MSJ.wpd
18

19

20

21

22

23

24

25

26

ORDER * 26